## Andrew H. McGowen v. David B. Bush.

Where it appeared that the note sued on was given in settlement of a charge of crim. con., under duress produced by threats of great bodily harm and deprivation of property, and that the plaintiff to whom the note had been assigned had notice, it was held that the suit could not be sustained.

It would seem that where the note sued on is shown by the defendant, to have been given in settlement of a charge of crim. con., it devolves on the payee, or those claiming under him, to prove the actual marriage ; evidence of general reputation and co-habitation and the confession of the defendant is not sufficient.

See this case as to a replication.

Appeal from Sabine. Tried below before the Hon. Archibald W. O. Hicks.

In the month of December, 1853, defendant removed from the State of Georgia to Texas. About the first of January, 1854, he rented the Smith place in Sabine county, on which he had several negroes and other property. He had not yet removed his family. He was fifty-nine years of age. He brought Saunders with him as his overseer, employed for the year. Biddle, his brother-in-law, had moved in company with him, and rented a place in same vicinity. About the first of Feb., 1854, witness (Biddle) was approaching Bush's place, which was on the main road, with his wagon, and he saw Saunders in the act of riding by the house and looking towards it; that after passing the gate, he suddenly stopped, went back, got down and hastily went into the house. Witness, getting opposite the house, went in and saw Saunders standing in the entry cursing Bush and talking loudly, being very angry; and his wife, or the woman he had with him, (witness did not know whether she was his wife or not,) passing through the entry at that time, Saunders pointed at her, and said that she and Bush had been having sexual intercourse (not in this language exactly.) Witness did not see Bush in the house, or hear him say anything. Witness passed through the entry, got water, and went back to the gate. Bush, coming out of the house, followed witness to the gate, and denied to witness Saunders' charge. Saunders came on to the gate, also, abusing Bush, and had a stick in his hand, but made no attack on Bush. Witness started off with his wagon, and Bush walked along by the wagon; seemed to be alarmed, and Saunders was cursing and abusing him as he went off. Saunders did not follow further than the gate. Witness, thinking that it would not do to leave them together, asked Bush to go on home with him; which he did. This was a while before sundown. That same evening one of Bush's negroes brought a note from Saunders to Bush, together with Bush's trunk, clothes and matress or bed. Bush remained at

McGowen v. Bush.

witness' house all night, and seemed to be distressed and alarmed. Said he was in a strange country ; did not know the people, and was afraid that he would be mobbed. The morning after, Bush sent one of Biddle's negroes after Thompson Allen, who lived on the road between his house and Milam, to come to him, and Biddle went to Bush's place, and talked to Saunders. Saunders swore that he would kill Bush if he ever saw him ; that Bush had ruined him and destroyed his happiness. Saunders had a double-barrel shot-gun. Witness proposed to Saunders that he and Bush should leave the matter to their neighbors, and named Thompson Allen, and Saunders said he would select Mr. Somers, and expressed his willingness to leave it to them. Witness went home, and during that day Thompson Allen, A. H. McGowen (the plaintiff,) and Mr. Somers came to witness' house and walked out with Bush, and seemed to be consulting about the difficulty. Witness heard nothing of their conversations, as Bush and Saunders were Masons, as he understood, and whenever he, witness, would be about them, that is Allen and others, they would quit talking about it. In the evening Bush, Allen, McGowen and witness went by the Smith place, (did not see Saunders,) to Mr. Allen's house, where witness left them. Witness, understanding that Bush was about giving his notes for some large amount, advised him not to do so ; and Bush replied that he did not know what to do ; that it was better to do that than to do worse. Witness heard Saunders say that Bush should not come on the place, and that he would not leave the place till he had full satisfaction ; and upon being asked by witness what would satisfy him, he said six thousand dollars. Witness being asked by plaintiff's counsel if Bush did not seem penitent, answered no, that Bush was scared to death. Witness stated that he had known Bush for forty years, and regarded him as a man of ordinary firmness ; never saw him frightened before. From the first evening of the difficulty, until after the notes were given, Saunders remained

on the place, in possession of the place, and negroes, &c.  A
day or two after the notes were given, McGowen and Allen
and Bush were at Biddle's, and it was proposed (as witness
thinks, by Mr. Allen,) to Bush, that he had better borrow the
money and pay the notes, if Saunders would discount them at
twelve and a half per cent.  Witness entered the credit of
three hundred dollars on the note sued on, which credit was
for two mules and a carryall or carriage, which Bush paid to
Saunders.  After Saunders got the mules and carriage, he and
Emily, the woman, his wife, went to A. H. McGowen's house
and remained some time ; and the next time he saw Saunders,
he and McGowen were riding to town in the said carriage,
drawn by said mules.  Saunders had nothing, that witness
knew of, more than one bed, and he came with him to this
country.  Bush is fifty-nine years of age.  Witness told Bush
what Saunders said.

There was a good deal of other testimony from which it
appeared that Saunders went armed with a double-barrel gun,
and swore repeatedly that he would kill Bush, if he did not
give him satisfaction, meaning in money ; and that he would
keep the property of Bush's then in his possession, until he got
satisfaction.  Some of these threats were in Bush's presence ;
others were told to him.  Bush appeared to be entirely un-
manned.  When assured of protection privately by one or
two of the witnesses, was afraid to trust them, and that all had
conspired against him.  Saunders made no threat of a legal
prosecution.

As to whether there had actually been any illicit intercourse
between Bush and Emily, the evidence, aside from Bush's com-
pliance with Saunders' demands, was merely that Saunders said
he saw one of them pass out of one door and the other out
of another of the same room as he rode up.  It was in Bush's
house ;  whether Saunders' private room, did not appear.
Witnesses who were at the house while the negotiation was
going on, testified that Saunders and Emily were cheerful and

pleasant to each other, as if nothing of the sort had happened. The Court excluded evidence offered by the plaintiff, that Saunders and Emily lived together as man and wife.

The notes given were for four thousand dollars.

It was proved that McGowan had no property which he could have given for the note sued on, which was for $1000, with the credit of $300.

Saunders soon afterwards left the country with the woman Emily.

*O. M. Roberts*, for appellant.

*J. M. Burroughs*, for appellee.

LIPSCOMB, J. This suit was brought by the appellant on a note of hand, given by the defendant to one Saunders, and endorsed by him to the appellant. The defendant set up in his answer several defences against the note sued on, in each of which he alleges that the plaintiff had notice : and here, although out of the proper order, we had as well say, that notice to the plaintiff, before the endorsement, is clear beyond controversy. It is not necessary to state the several defences set up by the defendant in his answer, because they all range under the following heads :

First, that the note was given under duress, and in fear of bodily injury, and great and irreparable loss of property.

Second, that it was given without any legal consideration.

And, lastly, that it was procured by fraud and combination.

We propose discussing these points in the order here presented. It is admitted that, at Common Law, duress, to avoid a deed or contract, must be under such cirucumstances as to put a man of ordinary nerve in fear of life or limb, or other great bodily injury ; and that the fear of the loss of mere property, will not sustain the defence of *duress per minas*. These are admitted to be sound legal propositions, by the ancient

Common Law, and we need not refer to the authorities ; but, by and by, we will consider how far these rules have been modified. If the defence of duress has been made out, it is not material to inquire whether there was a sufficient consideration to support the promise or not ; because, if there was, the duress would annul and avoid the act, whether by deed or by simple contract. There is some evidence that would conduce to show that the defendant had some grounds to fear that his life was in danger ; or, at least, that he would be subjected to ignominious punishment, such as being tied to a tree and whipped ; for the term "find himself looking up a tree" is well understood to mean that punishment ; which is of frequent occurrence with those lawless men who, in defiance of the civil authorities and the law of the land, take into their own hands the punishment of real or pretended offences. That the defendant was really greatly alarmed, is proven by several witnesses ; and by Biddle, one of the witnesses, that he was a man of ordinary nerve and not apt to be influenced and frightened at trifling or imaginary danger. The witness seems to be the only one well acquainted with him ; and he says that he had known him intimately for forty years, and had never seen him alarmed or frightened before. From this proof, the jury would have been authorized to find duress, according to the most stringent rules of the Common Law. It was, however, most abundantly in proof, that he was in fear of great and irreparable loss of his whole property, as forcible possession was seized of it, with a declared determination to hold on to it, until the defendant submitted to the terms imposed on him. And it was also in proof that Saunders, the person who had so unlawfully possessed himself of the defendant's property, and forcibly retained it, was wholly unable to respond in damages to the defendant for any injury or loss of his property. And this brings us to the consideration of the old Common Law rule, that fear of loss or injury to property will not constitute duress, to avoid an act done under such fear.

The reason given by the English Common Law writers for the distinction is, that the party so threatened with the loss of, or injury to, property, has ample remedy at law for all such damage as he may sustain. It is, however, most palpable to every one, that this reason fails in a case like the present, where the trespasser and threatener is entirely unable to respond in damages for such loss or injury. It would be insulting and trifling with a man to say to him, when one wholly insolvent threatens to destroy his most valuable property if he did not consent to an unlawful exaction, you should not have agreed to it because you could have recovered damages, if the threat had been executed. The rule never could have intended any such absurdity. It was general, and rested upon the presumption that the threatener was well able to respond in damages to the party whose property was threatened, and to be taken with the implied exception in a case where that ability did not exist. This construction of the rule reconciles it to common sense and practical use.

It is believed, however, that more modern decisions have still further modified the rule, and that it is not essential to make out the defence of duress from the fear of the loss of property, that the inability of the threatener should appear to answer in damages to the sufferer, if his property had been injured or destroyed ; that if there was reasonable ground to fear such loss or destruction of property, it would sustain the defence. It has been so held in South Carolina, uniformly, it is believed, since about the year seventeen hundred and ninety. (See 1 Bay, R. 13 ; Id. 470 ; 2 Bay, 241 ; 5 Hill, 154.) We can perceive no solid ground of objection, in so extending the doctrine of duress, founded in principle or policy. But we need not discuss it, because it does not necessarily arise in the case under consideration. The defendant has, in this case, made the inability of the threatener to pay damages an element of his defence, and the question is not presented, what would be the law if he had not so made it. It has been,

however, said, that the reason for not allowing the fear of the loss or injury to property to constitute duress, is founded in a wise policy ; that it is founded in the Roman Law ; that it was intended to foster and nurture courage and firm nerves ; and, as to property, those on whom the defence of the country depended, were not permitted to allege that they had been operated upon by their fears.   Whatever may have been the policy of the Romans, or the feudal barons of England, such is not the policy in this country ; for if there is any peculiarity in the people of this country, especially of this State, that should be restrained, it is a disregard to personal danger and a reckless indifference not only to the life of a fellow being, but to their own lives.   The records of our Courts are full of proof of this fact.   Believing as we do, that in this case the defence of duress was fully sustained by the evidence, and that the plaintiff had notice of the defence before the note sued on was assigned to him, this would suffice to affirm the judgment. But as the other defences were discussed, we will proceed to examine them.

The defendant sustained his defence of a want of consideration, unless the evidence offered by the plaintiff, that the note was given in consideration of the settlement of a ground of action, that the plaintiff's assignor had against the defendant. The compromise of a right of action would, in general, be a sufficient consideration to support an action.   If Saunders, the payee of the note, had a cause of action against the defendant for an illicit intercourse between the defendant and his wife, it would have been a good consideration for the note ; but, in that case, it would have been important to have shown that she was his wife.   If she was not, but only the kept mistress, the intercourse with her would have been a gross immorality on the part of the defendant, but would have been no ground of action for damages by the payee against the defendant.   It was, therefore, essential to have shown that the relation of husband and wife really existed between the payee of

the note and the woman called his wife. This ought to have been set up by a replication to the defendant's plea, in which he sets up matters showing the note was given without consideration. This was not done ; and here we may dispose of the plaintiff's exception to the ruling of the Court in excluding the question put by the plaintiff, whether the woman he, the payee of the note, was living with was his wife? It is believed that this evidence was properly ruled out on two grounds: First, the relationship between the woman called Emily and the payee of the note had not been put in issue by the pleading. Secondly, if it had been in issue, it was not the evidence that is required to establish the relationship between them to have been husband and wife. It required the same kind of evidence that would be required to sustain an action of *crim. con.* for damages ; and neither the confession of the defendant, cohabitation, nor general reputation, would be evidence. The actual marriage in such cases is required to be proved. (See Saunders on Pleading and Evidence, 395 ; 2 Chitty Pleading, 642, note f.; Phillips on Ev. Vol. 2, Book 4, pp. 210, 251 ; 7 Johns. R. 314 ; 4 Id. 56.) When the disturbance of the connubial relation existing between man and wife is relied on as a sufficient consideration to support a contract or note from the supposed adulterer to the injured husband, analogy would require the same proof that would have been required to support the relationship in a case of *crim. con.*, as before stated. There was no error, under the state of the pleadings, at any rate, in rejecting the evidence offered.

We proceed to the third and last ground, that the note was procured by a fraudulent combination of divers persons, some named and others not known. We believe the evidence fully sustains this defence. In the first place it raises a strong suspicion, that the charge made by the payee, Saunders, of an intercourse between the defendant and the woman he called his wife, was made by him without any grounds whatever, but made the occasion of the fraud designed to be perpetrated

upon the defendant. The evidence of this is, that only a few hours after the supposed grounds of suspicion, his domestic harmony seems to have been restored, and throughout the time he and his friends were carrying on their negotiation with the defendant, to procure his notes, they continued to live together as man and wife, as though nothing had disturbed their conjugal happiness. The evidence leaves the impression that Allen was the master spirit to operate on the defendant, Bush, to lead him, under the traitorous guise of friendly counsel, into the toils set for him. A few hours after Saunders professed to have become conscious of the great injury he had received by his wife's infidelity, he is seen to return to that home and wife, in company with the injured husband, and remains with him some time. Why did Saunders seek him at at that time? It was not to reconcile him to the offending wife. There seems to have been no occasion for that, as they appeared to be on a friendly footing already. Allen is next seen as the friend and adviser of the defendant. He tells him that the case is hard to settle, but thinks Saunders will settle it if money enough is given to him; that it will require eight or ten thousand dollars to satisfy him. Under the promises of friendly services, he undertakes the part of peace maker; in which the plaintiff in this suit was an active participant. He, Allen, is associated with others, for the purpose of fixing the amount of satisfaction to be paid. These persons first discuss whether it should not be six thousand dollars, but concluded that defendant will not stand more than four thousand dollars. After the notes and mortgage had been obtained for the amount, this man Allen again figures, by urging the defendant to take up the notes by getting a discount on them of ten per cent. Why such interest in the matter, if he was not to be a participant in a division of the spoil? He must have known that the charge made by Saunders against Bush, for an interference with his connubial happiness, was a fabrication, because he says that the harmony between the

supposed husband and wife was not disturbed ; that they lived as usual together. The plaintiff in this suit was active in all of these transactions ; he was friendly with the supposed husband and wife ; took them home with him, to his own house and family, as soon as they had closed the business with Bush ; and in a short time is the owner of one of the notes given by Bush, the one on which he brought this suit. How he could purchase it, is not shown ; but it is shown, that before this transaction he was worth scarcely any thing. They all knew that the ground or evidence of the guilt of the defendant Bush, with the defendant's so-called wife, was from the statement of the deeply injured husband, of nothing, but that on riding up to the house, in which he and the defendant both lived, he saw Emily go out at one door and Bush at the other. All of the evidence in relation to the transaction goes to show that it was a conspiracy framed for the purpose of swindling the defendant out of his property. He was an old man, sixty years of age; a stranger known to no one for any length of time, but to his brother-in-law, Biddle. He was thought to be a fit subject to be practiced upon, by alarming him with the threat of personal violence, and a loss of his property. The old man must have thought that Texas was truly a land of thieves and swindlers, and that he had fallen into the midst of them.

We believe that there is no error presented by the record ; and the judgment is affirmed.

Judgment affirmed.