Jesse H. OUTLAW et al., Appellants,

v.

Warren E. SETTEGAST et al., Appellees.

No. 3742.

Court of Civil Appeals of Texas.

Waco.

Aug. 4, 1960.

Rehearing Denied Sept. 15, 1960.

Bracewell, Reynolds & Patterson, Joseph Jaworski, Houston, for appellant.

Andrews, Kurth, Campbell & Bradley, Bass C. Wallace, Houston, for appellee.

WILSON, Justice.

The action is to recover sums alleged to have been paid under business compulsion and duress. It does not yield to brief statement.

Plaintiffs alleged a written contract for sale of two lots, under which they agreed to pay $45,775 purchase price; that they paid to defendant Outlaw, all but $35,000, which was evidenced by a vendor's lien note due on or before July 12, 1955, secured by deed of trust; that after delivery of deed to them, they began and completed con-

struction of improvements on the property, a portion of which they sold; that from the proceeds they paid to Outlaw $25,000 on principal, and interest which would have been due on the note to July 12, 1955, leaving a $10,000 principal balance, less overpayment of interest; that a partial release of lien as to the portion sold was thereupon executed, leaving the lien unreleased as to a tract we will refer to as the remainder.

Plaintiffs pleaded they had engaged in negotiations with Outlaw for purchase of a narrow strip adjoining the remainder (which will be called the street); that the street was involved in litigation by which Outlaw was seeking to clear his title to it; that when this litigation was settled, plaintiffs advised Outlaw they were willing to purchase the street for $10,000, provided a title policy issued by a specified title guaranty company was furnished. They alleged that in the course of negotiations, Outlaw was advised they desired release of the lien on the remainder in order to refinance indebtedness for construction of buildings on it, and that, although they could discharge the $10,000 principal balance on the existing note, they preferred to substitute security, obtain release of the original lien, and consolidate the existing debt with that for the purchase price of the street, to be evidenced by a new note for $20,000 secured by lien on other property; that this procedure was agreed upon.

The petition alleges the agreement was carried out by delivering a new $20,000 note dated July 15, 1955 to the specified title guaranty company, as "escrow agent," together with the release of lien, a deed to the street and the original $35,000 note; that plaintiffs and Outlaw agreed no further payment would be due on the latter note, and no payment would be due on the new note until a title policy was issued by the company; or until it finally refused to issue a title policy, in which event the instruments deposited would be withdrawn, and they "would then revert to the original trade."

Defendant, Outlaw, it was claimed, without notice to plaintiffs, and notwithstanding the escrow agreement, purported to sell the remainder under power of sale in the deed of trust; purchased it at the trustee's sale, and then conveyed it to Terra Firma, Inc., a corporation which was his alter ego. In the meanwhile, plaintiffs alleged they had borrowed a large sum from a Houston bank, due in December, 1955, for interim financing, and had arranged refinancing contingent on their furnishing evidence of marketable title; that with their title clouded by the purported foreclosure, they could not meet their obligation to the bank and bankruptcy would have ensued; that Outlaw thereupon demanded a total cash payment of $27,000 ($7,000 additional) and acceptance of a title policy from a different company in return for a reconveyance; that under protest, and to avoid financial ruin, and solely by reason of business compulsion and duress, they acceded to the demands and paid the additional $7,000 for which they asked judgment. Defendants pleaded waiver, estoppel, and that the additional payment was a compromise.

The jury found (1) there was an agreement to extend payment of the balance of the $35,000 note to a definite time in the future; (2) that such time was after November 1, 1955 (the foreclosure date); (3) and (4) that the additional payment was made under duress. Other issues were answered favorably to plaintiffs. Judgment for plaintiffs was rendered in the amount found by the jury to have been paid under duress.

Defendants say there is no evidence to support the second finding, and insufficient evidence to support the first and second.

There was no written escrow agreement under which the original $35,000 note, the new $20,000 note, the release, the deed to the street and new deed of trust were deposited with the designated title guaranty company. The agreement under which the deposit was made was oral. Appellant

states the fact issue as being "whether the parties made a definite agreement to extend the due date of the $10,000 balance of the $35,000 note."

Appellant's position was not that there was no agreement to extend payment to a "definite time in the future"; his testimony was that "I never agreed to extend at all." The evidence shows that immediately after the "escrow" deposit on July 12, Outlaw left the city for several weeks. When he returned he inquired of a clerk at the title company's office whether the title policy had been issued, and upon being informed it had not, obtained the release, deed, deed of trust and $35,000 note from the clerk. Such delivery was without knowledge or consent of the president of the title company, in whose keeping the documents were deposited. There was evidence this removal of documents was without plaintiffs' knowledge, and that they assumed that efforts were continuing to clear title and have the policy issued. There was evidence Outlaw's attorneys did continue efforts to clear title and cure objections made by the title company; that Outlaw obtained a building permit for plaintiffs; and that they had no knowledge the title policy would not be issued, until after foreclosure. The evidence showed the designated title company had made a requirement that the City of Houston officially vacate and abandon the street and that a quitclaim deed be obtained, and that plaintiffs were not informed the curative requirements could not be met until subsequent to the foreclosure.

As to the agreement with defendant Outlaw, plaintiff testified, "We agreed that he would extend the note from the closing [escrow deposit] date of July 12th until we could get the papers drawn up on this transaction, which he assumed would be three or four days, which was until July 15th, and during that time we agreed to pay interest on" the $35,000 note balance. "He said, 'That's fine. We will extend the note and carry it on until you get the title policy and all of the papers are signed'";

that interest would be paid to July 15th, and if the policy was not then issued, interest would not be paid, but would accrue until the policy was issued and the transaction consummated; that the new $20,000 note would be paid in three years; that the instruments would be "held in escrow" until the policy was issued, or the company finally refused to issue it; that time of payment was extended "until the new note took over; up until three years" from July 15, 1955.

Defendant testified, "Settegast had propositioned me to renew the note on those two pieces of property that I could handle, and I finally agreed to it if he would put his paper up in the title company." He testified it was agreed the instruments would be deposited with the title company to be held by its president; that he regarded a favorable judgment in the litigation to clear title as giving him clear title to the street, and he did not discuss title difficulties with plaintiffs; that the deposit was made with the understanding the title company would inform them "one way or the other, which way, whether they could or could not" issue the policy; that no date was set for the issuance of the policy, but the deposit was "on the theory" it would take four or five days; that the papers were deposited with the president of the title company to be held pending issuance of the policy; that at the time he obtained his papers from the depository he did not know whether its requirements had been met; and wasn't interested, as he knew he had a good title; that plaintiffs "tricked me into getting something put up in escrow"; that "the papers were put there until they issued a policy"; that he did not tell plaintiffs the "deal was off", because he was "still interested in it going through"; that he did not notify plaintiffs, up to November 1st that he had posted notices and was foreclosing. By deposition he testified he never did notify plaintiffs he had "picked up these papers."

The "escrow" agent's president testified he did not notify plaintiffs until after the

foreclosure that his company would not issue a title policy; that he was to hold the instruments "until the whole transaction was closed"; that the $20,000 note and deed of trust was "to be substituted as security for the balance owing on the indebtedness, and that other property was to be released"; that the new note was substituted for the balance on the $35,000 note; that issuance of the title policy was contingent on the City of Houston's vacating and abandoning the street; that the papers presumably were to be held "until the city had said 'yes' or 'no' on vacating and abandoning the street." The city did not say "no" until after the foreclosure.

All parties state that the case is governed by the rule in Ward v. Scarborough, Tex.Com.App., adopted 236 S.W. 434, 437 that "when a debt bears interest either by convention or operation of law, the effect of an agreement by the parties for an extension for a definite time is that the creditor is bound to forbear" during the period of extension, and that accrual of interest is sufficient consideration. The doctrine of duress was there applied under somewhat analogous facts. That case also announces the principle that "to constitute duress it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils as inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand." The "compulsion is sufficient if it induces the particular person claiming duress to perform some act which he is not legally bound to do, contrary to his will," wrongfully or oppressively.

■■ Assuming—as the parties seem to do—but without deciding,[1] that extension of the date of payment to a definite time in the future was an essential element under the record in this case, we overrule the contention that there was no evidence to support the second finding; and the points relating to insufficiency of the evidence. As between the parties, under this record, a determinable future time after the occurrence of a specified event, certain to happen, is a definite time. The record shows the title guaranty company had only two alternatives: to issue the title policy, or finally refuse to do so. One of these specified events was certain to occur, and the occurrence of one or the other was not a mere contingency. We do not construe the term "definite time" as meaning a definite date, as appellants apparently contend. 10 C.J.S. Bills and Notes § 265, p. 760; 11 Words & Phrases, Definite Period, page 603.

■ Appellants next contend the court erred in submitting issues relating to extension of time of payment because they deal with contract, whereas the cause of action sounds in tort; and "because essential elements of the tort cause of action were not submitted to the jury." Complaint is made that another issue misplaced the burden of proof. Objections to the charge on these grounds were not made in the trial court as required by Rules 274 and 279, Texas Rules of Civil Procedure. A special issue was submitted inquiring whether the payment was made under duress. "Duress" was defined. The objections to this issue were that it was a general charge, was a conclusion, and was inadequate. The points, under these objections, present no error for review under settled construction of Rule 279. Appellants' points are overruled.

■ Appellees cross-assign error to failure to allow interest from date of payment under duress to date of judgment. The principal damages were fixed by conditions existing at the time of payment under duress. We find no reason why interest should not be allowed on the amount deter-

1. As to rights of the payee where the depository, or escrow agent, surrenders possession of a note before occurrence of the specified event, see 7 Am.Jur., Sec. 40, p. 811; 48 A.L.R. 405, 418; 10 C.J.S. Bills and Notes § 490, p. 1083; Adams Nat. Bank v. Stone, Tex.Civ.App., 284 S.W. 989, 991.

mined to have been so paid. Texas Company v. State, 154 Tex. 494, 28 S.W.2d 83, 89, 93. The judgment is reformed to provide for recovery of interest on $6700 at 6% per annum from December 1, 1955, the date of payment. As so reformed, the judgment is affirmed.