**TOWER CONTRACTING CO., INC. OF TEXAS, Appellant,**

**v.**

**BURDEN BROTHERS, INC., Appellee.**

**No. 17898.**

Court of Civil Appeals of Texas, Dallas.

June 22, 1972.

Rehearing Denied July 20, 1972.

D. Samuel Coats, Clark, West, Keller, Sanders & Ginsberg, Dallas, for appellant.

Charles H. Storey, Dallas, for appellee.

CLAUDE WILLIAMS, Chief Justice.

This is an appeal from a judgment rendered *non obstante veredicto* in favor of appellee in its action against appellant on a promissory note.

Tower Contracting Company, Inc. of Texas (hereinafter referred to as Tower) is engaged in the general construction business. Burden Brothers, Inc. (hereinafter called Burden) is in the mechanical contracting business doing primarily heating, air conditioning and plumbing work. The two Texas corporations had been involved in numerous business transactions, both in Texas and other states, for approximately

ten years. Tower would generally be the contractor on the job and Burden the subcontractor.

On and before September 30, 1965 Tower was the general contractor for the erection of a multi-story office building in Dallas, Texas known as the Blanton Tower. Tower was also the owner of the property. On that date Tower was indebted to Burden, which was the mechanical subcontractor for the improvements, such debt being delinquent. Tower was also indebted to several other subcontractors furnishing labor and materials for the building. At that time Tower was also six or eight months in default of its interim loan to Mercantile National Bank of Dallas and such bank was threatening foreclosure. On that date the capital stock of Tower was owned by J. D. Blanton, except for one share owned by J. Raymond Jones and one share owned by Ben Goodwin. On such date there was pending in the district court of Dallas County a suit styled J. Raymond Jones, Plaintiff vs. Ben Goodwin et al and J. D. Blanton, Defendants, in which Jones was attempting to enforce an alleged oral agreement to vest in him fifty per cent of the common stock of Tower. In such action an injunction had been obtained which restrained the officers, directors and shareholders from meeting or taking any action to accept a loan commitment in the sum of $3,800,000 from Teamsters Union Pension Fund which Jones had in his possession since August, 1965 and which loan was sufficient to pay Mercantile Bank as well as the subcontractors and other debtors of Tower. In the light of the internal fight for control of Tower, Burden, on September 30, 1965, perfected its mechanic's and materialman's lien covering the work it had performed on the Blanton Tower project and thereafter, on October 15, 1965, it intervened in the Blanton case in which it prayed for a mandatory injunction to force the officers, directors and stockholders of Tower to accept the outstanding loan commitment, foreclosure of its liens, and the appointment of a receiver. On November

3, 1965, all parties in the Blanton case, including Burden, entered into an agreement whereby the loan commitment would be accepted, Jones would acquire all of the stock of Tower which included its principal asset, Blanton Tower. On November 5 all parties entered a consent order authorizing the meeting of Tower's shareholders and board to elect officers and accept the loan commitment. Pursuant to the agreement Jones acquired all of the Tower stock and obligated himself and Tower to pay to J. D. Blanton or to the Blanton Trust $250,000 in cash, and a note for $240,000. Jones further obligated himself to "take such action as may be appropriate, including the execution of any necessary documents, to hold the Guardian of the Estate of J. D. Blanton harmless from any claims which may be asserted by any trade creditors of Tower Contracting Co. Inc. of Texas and J. D. Blanton Construction Company, Inc., existing as of November 1, 1965." The agreement was approved and ratified in the court's final judgment in the Blanton case entered on January 28, 1966. In these negotiations J. Raymond Jones was represented by William H. Clark III and Burden was represented by Charles H. Storey.

When Burden's lien on the Blanton Tower was perfected on September 30th it secured a debt of $142,062.80. Thereafter, Burden continued to furnish labor and materials to Blanton Tower to the date of closing, at which time its principal debt on the Blanton Tower project was $150,298.30. Burden contended that since payment of its indebtedness on the Blanton Tower project had been delayed it was entitled to interest on such indebtedness in the sum of $17,047.54 and it also contended that it was entitled to indebtedness, as well as interest, on projects previously performed for Tower in Mobile, Alabama, Palo Alto, California, and on the Tower Restaurant in Dallas, amounting to a figure in excess of $40,000. On January 24, 1966, following a conference between attorneys Clark and Storey, attorney Storey, representing Burden, addressed a letter to attorney Clark,

representing Tower, in which he advised that "certain questions have been raised by my clients which I thought it best to call to your attention in advance of the Wednesday closing so that, if necessary, this closing may be deferred until these questions are resolved. I trust that a delay will not be necessary, but my clients properly feel that since, as a practical matter, they are being called upon and have been called upon, to finance a major portion of this project they should have a complete disclosure insofar as disbursement of the loan proceeds is concerned." The letter then proceeds to outline the debts which are being paid from the loan proceeds which included an item of "Trustees $250,000.00." While questioning the right to expend the sum of $250,000 of the loan proceeds for the purpose of purchasing the shares of stock by Jones, Storey stated he felt "that I can get my clients to go along with this payment if all remaining funds are properly accounted for and applied to their debts." He then outlined Burden's debt as being $150,298.30 plus $17,047.54 as interest, totaling the sum of $167,345.84. This sum represented Burden's claim for work on the Blanton Tower and secured by its lien. The letter then contained the following paragraph:

"In addition to the debt of Burden Brothers, Inc. shown above, there are other outstanding debts owed to it which should be simultaneously resolved. If it is in fact necessary to apportion cash payments to the above debts, then these additional debts hereinafter mentioned would not be included in the apportionment. They should, however, be included in any deferred balances owed to Burden Brothers and the installment payments fixed so as to simultaneously liquidate them. These additional debts are as follows:

| | |
|---|---|
| Capital Inn, Mobile, Alabama | $22,170.81 |
| Palo Alto, California, Cabana | 10,655.80 |
| Tower Restaurant, Dallas | 6,941.26 |
| Tower Contracting, Miscellaneous | 940.00 |
| Total | $40,707.87" |

Storey, in the letter, also stated that Burden was claiming reasonable attorney's fees but said: "I am sure that you and I can agree upon a reasonable fee in event the other matters can be resolved."

This letter was duly received by attorney Clark. Although it had been planned by the parties to consummate the distribution of the funds from the loan commitment on January 28th the closing was not actually had until the 31st of January, 1966. On this date Jones, his attorney Mr. Bill Clark, and Sam Suri, the accountant for Tower, met at the title company to close the transaction. No official of Burden was present at the closing. On that occasion, and as a part of the closing, Burden accepted the sum of $107,811.64 in cash; a note in the sum of $46,679 (referred to as Note No. 1); and another note (referred to as Note No. 2) in the sum of $48,828.80, totaling the sum of $203,319.44.

It is undisputed that in this final closing on January 31, 1966, Tower, acting through Jones, received the permanent loan of $3,800,000 and disbursed this amount in favor of Mercantile National Bank, as well as other lienholders and creditors, including Burden. It is also without dispute that from this loan Jones paid the sum of $250,000 to the stockholders and thereby became the principal owner of the corporation.

Note No. 1, referred to above, was paid, but Note No. 2 was not paid. Burden brought this action to recover on this note. Tower answered by asserting defense of (1) want of consideration; (2) offsets and credits; and (3) duress.

The case was tried before the court and a jury and at the conclusion of the evidence thirteen special issues were submitted to the jury in the court's charge. Special Issue No. 1 inquired: "Do you find from a preponderance of the evidence that the Defendant was under duress from the Plaintiff when it executed the note dated January 28, 1966?" To which the jury answered "We do." Because of conditional submission, the jury was not required to answer any

of the other remaining issues which dealt with the defenses of consideration and offsets. The trial court then sustained Burden's motion for judgment *non obstante veredicto* and rendered judgment that it have and recover of and from Tower the amount of the note sued upon, plus interest and attorney's fees.

Tower's appeal is based upon two points of error: (1) that the judgment *non obstante veredicto* should be reversed and rendered because there was evidence to support the jury's answer to Special Issue No. 1 that Tower was acting under duress from Burden when it executed the note; and (2) that such action of the trial court in rendering judgment *non obstante veredicto* deprived the appellant of the right to have jury findings relating to the issues of lack of consideration and offsets.

In support of its first point of error appellant Tower relies chiefly upon the testimony of its president, J. Raymond Jones, who testified that the first time he became aware of the note made the basis of this litigation was when it was presented to him for his signature, among other papers and notes, at the time of the closing of the permanent financing arrangements on January 31, 1966. Jones testified:

"Q Is it your testimony that on January 31, 1966, when you went to the title company to close on the permanent financing, you had no knowledge of the $48,000 note?

A That is correct.

Q At the time you signed this note, Mr. Jones, did you make that fact known?

A Yes sir, I sure did.

Q Who was present at the time you signed the note?

A Mr. Storey.

Q All right, who else?

A The man at the title company, Mr. Bill Clark, and Sam Suri, and myself, and people were running in and out of there all the time. I signed fifteen to twenty notes that day. This was on the bottom and I said, 'I don't owe this note'.

I had been doing business with Charles [meaning Charles Burden] for twelve to fifteen years and I say 'Okay, if I have to sign it', I felt I could go and talk to them afterwards and find out what it was all about. I have tried for five years and I couldn't talk to them about it.

Q Mr. Jones, you say you did sign the note though?

A Yes, sir, I signed it.

Q Now, why do you say you had to sign it?

A If I didn't sign it, I would have lost everything that I had worked for. Burden Brothers would have lost what they had put in the job as well as about fifteen or twenty other people.

Q You had a $3,800,000 loan at stake?

A That is correct.

Q And you had certain liens that had to be released?

A They all had to be released."

When asked why he could not have delayed the closing of the deal he responded:

"A Well, we had been delaying the closing since the first of the year. The Bank was anxious for their money and they were ready to close. Charles [meaning Charles Burden] had already filed their lawsuit to foreclose their lien, and the agreement I had to buy out the other interests in the Tower Contracting Company and I had until February 4th to close that deal, to pay them that money

and receive that stock; I would have lost everything. I had no choice. If it had been $100,000, I would have signed it. I knew I could work it out with Charles later."

On cross-examination Jones admitted that his attorney, Mr. Clark, was present at the time the note was presented to him. He admitted that he did not ask his attorney for an explanation of the note. He agreed that his attorney had full authority to represent Tower and to negotiate with Burden.

Mr. Suri testified that when the note was given to Mr. Jones to sign he asked: "What is this, Bill?" (referring to Bill Clark), and he said, "Well you just have to sign it or the deal is off otherwise."

A careful review of the entire record in this case convinces us that there is no evidence of actionable duress or business coercion causing the execution of the note sued upon. We think that the record as a whole establishes the absence of duress, as a matter of law.

Questions concerning duress, duress of property, and business coercion have been made the subject of numerous law review articles, textbooks, and decided cases both in Texas and in other jurisdictions.[1]

■ The courts of Texas have consistently adhered to the common law doctrine of duress as well as a more modern doctrine of duress of property. McGowen v. Bush, 17 Tex. 195, 201 (1856); Oliphant v. Markham, 79 Tex. 543, 15 S.W. 569, 23 Am.St.Rep. 363 (1891). Our law is definitely settled that where the will of the individual is overcome by threats directed against his property the law will not enforce agreements obtained while under such threat of force. 21 Tex.Jur.2d, "Duress and Coercion", § 3, p. 117. What constitutes duress is a question of law but whether the facts exist to make up the elements of duress may be an issue of fact. 21 Tex.Jur.2d, "Duress and Coercion", § 9, p. 120; Sanders v. Republic National Bank of Dallas, 389 S.W.2d 551 (Tex.Civ.App., Tyler 1965); and Brooks v. Taylor, 359 S.W.2d 539 (Tex.Civ.App., Amarillo 1962).

■ While the authorities cited in the footnote demonstrate a lack of unanimity on the question, our courts of Texas have consistently followed the rule, as a matter of law, that (1) there can be no duress unless there is a threat to do some act which the party threatening has no legal right to do; (2) there must be some illegal exaction or some fraud or deception; (3) the restraint must be imminent and such as to destroy free agency without present means of protection. Ward v. Scarborough, 236 S.W. 434 (Tex.Comm'n App. 1922); Dale v. Simon, 267 S.W. 467 (Tex. Comm'n App.1924); Hall v. Odiorne, 14 S.W.2d 870 (Tex.Civ.App., Austin 1929, writ dism'd); Goodrum v. State, 158 S.W. 2d 81 (Tex.Civ.App., Galveston 1942, writ ref'd w. o. m.); Fischer v. Richard Gill Co., 253 S.W.2d 915 (Tex.Civ.App., San Antonio 1952); Metro-Goldwyn-Mayer Distributing Corp. v. Cocke, 56 S.W.2d 489 (Tex.Civ.App., Amarillo 1933); Outlaw v. Settegast, 338 S.W.2d 291 (Tex.Civ.App., Waco 1960); Lawrence v. J. M. Huber Corp., 347 S.W.2d 5 (Tex.Civ.App., Waco 1961); Brooks v. Taylor, 359 S.W.2d 539 (Tex.Civ.App., Amarillo 1962); Sanders v. Republic Nat. Bank of Dallas, 389 S.W. 2d 551 (Tex.Civ.App., Tyler 1965); Daugherty v. Gower, 403 S.W.2d 535 (Tex.Civ.

1. A most comprehensive and in depth study of the gradual expansion of the ancient common law doctrine of duress is found in "Economic Duress—An Essay in Perspective", by John P. Dawson, 45 Mich. Law Rev. 253–290; and "Duress Through Civil Litigation", by John P. Dawson, 45 Mich.Law Rev. 571–598 and 679– 716. See also "Economic Duress", by John Dalzell, 20 N.C.Law Rev. 237 and 341 (1942); 13 Williston on Contracts, 3d Ed., 647–683 (1970), and cases therein cited; Restatement of the Law of Contracts, §§ 492 to 498; and 17A Am. Jur. 564, § 7, and cases therein cited.

App., Amarillo 1966); and Scurlock v. Lovvorn, 410 S.W.2d 525 (Tex.Civ.App., Dallas 1966).

■ When we analyze the record developed in the trial court in the light of these authorities the conclusion is inescapable that appellee was doing nothing more than exercising its legal right in a proper manner by requiring appellant to execute the note in question, which represented delinquent accounts alleged to be due, before releasing its materialman's and mechanic's lien on the Blanton Tower property. The picture presented by this record is far different than those presented in cases relied upon by appellant where the party executing the agreement, or paying money, is required to by economic pressure brought about by a wrongful or illegal act or threat. Illustrative of these cases is Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922 (1948), in which the Supreme Court held that the City of Corpus Christi was attempting to collect an illegal tax from a taxicab company.

In the situation here presented appellee Burden was within its legal rights in demanding that its mechanic's and materialman's lien on the Blanton Tower project be released as a part of the settlement agreement, both growing out of the Jones versus Blanton lawsuit and also by virtue of negotiations which had been carried on by the attorneys for the respective parties at a time prior to the final closing date. Appellee Burden had a perfect right to negotiate with Tower to the end that it, Burden, would not require Tower to pay off the lien in cash but instead to give it part cash and a note for the balance. In addition, it had a perfect right to require Tower to take care of its other claimed indebtednesses in the form of the note referred to as Note 2. All of these matters were part and parcel of an agreement to settle and compromise the differences between the parties and to adjust their legal positions.

It is also quite significant to observe that Tower, and its attorney Bill Clark, had notice for several days concerning Burden's claim to the right to have its claimed accounts brought up to date and disposed of contemporaneously with the closing of the Blanton Tower transaction. It cannot be said that this proposition was a last-minute or "pistol to the head" threat on the part of Burden. Moreover, at the time the note was executed Mr. Clark, attorney for Tower, was present and made no protests. While it is true that he told Jones that unless he signed the note the "deal would be off", this could not come as a surprise to the attorney since he and Mr. Storey, attorney for Burden, had been negotiating concerning the closing for several days prior to the closing date. Thus it is evident that the alleged threat was not so imminent as to destroy free agency on the part of Tower.

Accordingly, we find that the alleged threat made by Burden to require Tower to execute the note in question was not a threat to do an illegal act nor was it a threat by Burden to exercise a legal right in a wrongful manner but, on the contrary, was the exercise of a legal right in a proper manner on the part of Burden so that the execution of the note by Jones for Tower was not caused or brought about by duress, as a matter of law.

■ In its alternative second point of error appellant contends that the action on the part of the trial court in granting judgment *non obstante veredicto* effectively deprived it of jury findings relating to the issues of lack of consideration and offset. It argues that if it should be held that the execution of the note was not brought about by duress then the case should be reversed and remanded to the trial court so that these defensive issues could be submitted and answered. The essence of appellant's contention is that since there was no real verdict in this case there can be no judgment *non obstante veredicto*. It relies upon Fitts v. Carpenter, 124 S.W.2d 420 (Tex. Civ.App., Eastland 1939) and Whisenant v. Fidelity and Casualty Co. of New York, 354 S.W.2d 683 (Tex.Civ.App., Dallas 1962).

These authorities are not applicable for the reason that in each case there was an incomplete verdict and it was correctly held that a judgment *non obstante veredicto* was improper. However, the verdict here was complete. The jury answered Special Issue No. 1 in the affirmative and was expressly instructed by the court that in the event of such answer they need not answer any of the remaining issues. This constituted a complete verdict pursuant to the instructions of the court.

■ Appellant directed no objections to the manner in which the trial court conditionally submitted its various special issues relating to its defense of lack of consideration and offsets. By failing to object to the method of submission of the issues appellant has effectively waived its right to have same answered by the jury. Rules 272 and 279, Texas Rules of Civil Procedure. Our Supreme Court in Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985 (1949), held that it was incumbent upon a party asserting an affirmative defense to see that the jury answers all essential elements of the defense in his favor, or to object to the submission of the case to the jury in such manner that an answer on an essential element will be prevented. The same rule was applied by the Supreme Court in Bay Petroleum Corporation v. Crumpler, 372 S.W.2d 318 (1963), in which Chief Justice Calvert pointed out that by failing to object to the conditional submission of issues the party waived its right to have them answered. To the same effect see Strauss v. LaMark, 366 S.W.2d 555 (Tex.Sup.1963); Knight v. Stewart, 287 S.W.2d 748 (Tex.Civ.App., Dallas 1956); Barrett v. Curtis, 407 S.W.2d 359 (Tex. Civ.App., Dallas 1966); and Bell v. Aetna Casualty & Surety Co., 394 S.W.2d 830 (Tex.Civ.App., Houston 1965, writ ref'd n. r. e.).

Appellant's points of error, having been carefully considered, are found to be without merit and are therefore overruled. The judgment of the trial court is affirmed.

Affirmed.