IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-1822
(Summary Calendar)
_____


Joe Rosas and Henry Perez,
Individually and d/b/a Cleburne
Joint Venture No. One
and Beatrice Rosas,

                                    Plaintiffs-Appellants,

                    versus

The United States Small Business
Administration, Meadowbrook
National Bank, Mel B. Wilde, and
Ray Collins, Substitute Trustee,

                                    Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Texas
_____
(May 21, 1992)

Before JONES, DUHÉ, and WIENER, Circuit Judges.

Per Curiam:

        Plaintiffs-Appellants, Joe Rosas and Henry Perez, individually

and doing business as Cleburne Joint Venture No. One, and Beatrice

Rosas (collectively "Appellants" or "the Joint Venture"), appeal

summary judgments in favor of the United States Small Business

Administration (the SBA), its substitute trustee Ray Collins

(Collins), Meadowbrook National Bank (Meadowbrook), and its

president Mel B. Wilde (Wilde).  Finding no reversible error, we

affirm.

I.

FACTS AND PROCEEDINGS

In August of 1987, the Appellants obtained a $280,000 loan, amortized over 20 years, from a third party bank, Independence Mortgage (Independence), for permanent financing of a convenience market to be constructed by the Joint Venture. The SBA provided an 85 percent guaranty for the loan. Another third party bank, the First National Bank of Cleburne (First Bank) agreed to provide interim funding and was given a first lien on the property. In less than a year, the Joint Venture became delinquent on the First Bank loan because, according to Rosas and Perez, the $280,000 ran out before construction was completed.

The Joint Venture then obtained a commitment from Independence to increase the amount of the permanent mortgage loan by $30,000, but First Bank refused to advance the additional funds. Even without the additional funds, in July of 1988, Rosas and Perez decided to open the market, despite incomplete construction and lack of capital with which to purchase inventory.

The next month, Rosas negotiated[1] with Mel Wilde, president of Meadowbrook National Bank, about providing the needed financing. In early September, Meadowbrook issued a 60-day commitment to the Joint Venture in which it agreed to fund a $400,000 loan amortized over 20 years if the SBA agreed to an 80 percent guaranty. The

---

[1]There seems to be some disagreement with respect to whether it was Rosas or Wilde who suggested that Meadowbrook consider extending a loan to the Joint Venture. The discrepancy is not, however, material to the summary judgment.

resulting SBA loan package, however, called for an amortization of 15 years instead of 20, and a guaranty of 85 percent instead of 80.[2]

Later in September, First Bank as the initial interim lender posted the market property for foreclosure, and demanded turnover of all equipment and inventory securing its loan.

In December, at the closing of the $400,000 loan, the Appellants signed an SBA Authorization and Loan Agreement (the Authorization), previously approved by the SBA, which reflected the 15 year amortization and 85 percent guaranty. The Authorization specified the proportions of the $400,000 that were to be used for the purchase of land, equipment, and inventory, and for construction. The Appellants claim to have protested the 15 year amortization, stating they were told by Wilde to sign the note as is, and he would later modify the amortization to 20 years.

At the closing, Meadowbrook and the SBA also discovered that several mechanics and materialmen's liens, aggregating $55,801.70, for debts incurred by the Joint Venture in the initial construction still stood against the market property. The Appellants contend that the lien creditors had not performed their contracts in accordance with specifications, and thus were not entitled to be paid. Nevertheless, the title insurance company would not issue a title policy unless the liens were released, so Meadowbrook negotiated lien payoffs with most of the creditors, and agreed to

---

[2]Although Meadowbrook argues on appeal that the SBA would only approve a 15 year payout, the guaranty application, made by Wilde on behalf of Meadowbrook, requested only a 15 year payout.

3

add $25,000 to the loan package to accomplish the lien payoff. Wilde claims that Rosas and Perez disputed only one of the liens, for which Meadowbrook escrowed the payoff pending a resolution.

Once all of the settlement charges were paid, including lien creditors and First Bank, there remained virtually no money for completion of the market or purchase of inventory. Therefore, the Appellants closed the market and began searching for additional funding. After an aborted attempt to secure funding through another bank, the Appellants returned to Meadowbrook. It agreed to fund an additional $80,000 loan, again guaranteed by the SBA. This time Meadowbrook retained $25,000 of the $80,000 to pay off an interim loan,[3] and used another $24,206.36 to service the $400,000 debt. Apparently, the Appellants received the remaining $30,000 for operating capital.

The Appellants also maintained an operating account at Meadowbrook into which they deposited all receipts of the market. The Appellants contend that in June of 1989, Meadowbrook began to dishonor some checks drawn against the operating account despite the presence of sufficient funds to pay the checks. Meadowbrook agrees that on at least one occasion it did refuse to honor a check even though there were sufficient funds, justifying its action on the ground that the Appellants were attempting to purchase equipment in violation of the limitations set forth by the SBA's Authorization and Loan Agreement for the $80,000.

---

[3]It is not clear from the record whether this $25,000 is the same $25,000 added to the original $400,000 to cover the payoff of the creditors.

4

Late in 1989, the Appellants again approached Meadowbrook for additional funding. The Appellants were at least six months delinquent on both the $400,000 note and the $80,000 note. Meadowbrook refused the additional funding. In January of 1990 Meadowbrook requested that the SBA purchase its guaranties, which it agreed to do. Thereafter, the SBA initiated foreclosure.

The Appellants brought suit in Texas state court against the SBA and Ray Collins, the substitute trustee, for promissory estoppel and to enjoin the SBA's foreclosure action. They also brought actions against Meadowbrook and Wilde for breach of contract, negligent misrepresentation, breach of duty of good faith and fair dealing, duress, and breach of depository agreement. The SBA removed the action to federal district court. After initially denying motions to dismiss and motions for summary judgment filed by the SBA and Collins, the court granted summary judgment to Meadowbrook, Wilde the SBA, and Collins.

In its memorandum order, the district court rejected the Appellants' contention that the statements made by Wilde at the December closing of the $400,000 loan were negligent misrepresentations. Instead, the court found them to be inadmissible under the parol evidence rule. The court also rejected the Appellants' claim for breach of duty of good faith and fair dealing, finding that Texas does not recognize such a duty from lender to borrower. And the court rejected the duress claim because it found that the Appellants' assertions were conclusory

5

and unsupported by fact or authority.  The court did not address the breach of depository agreement claim.

The Appellants timely appealed the district court's final judgment.

## II.

## STANDARD OF REVIEW

This court reviews the grant of summary judgment motion de novo, using the same criteria used by the district court in the first instance.[4]  We "review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party."[5]  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6]  Fed.R.Civ.P. 56(e) requires that when a proper motion for summary judgment is made, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.[7]  The mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  A dispute about a material

---

[4]Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir. 1988).

[5]Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc., 804 F.2d 879, 881 (5th Cir. 1986)(per curiam)(citing Southmark Properties v. Charles House Corp., 742 F.2d 862, 873 (5th Cir. 1984)).

[6]Fed.R.Civ.P. 56(c).

[7]Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

6

fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8] "Material facts" are "facts that might affect the outcome of the suit under the governing law."[9]

## III.

## ANALYSIS

A.   Negligent Misrepresentation

The district court rejected the Appellants' contentions that Wilde's statement at the closing, indicating that he would convert the loan from a 15 to a 20 year payout if the Appellants would sign the note, was a negligent misrepresentation.  The court concluded that the statement was inadmissible under the parol evidence rule. We agree.

Even assuming the Appellants' allegations are true, Wilde's alleged representations fall squarely within the ambit of the parol evidence rule making such representations inadmissible evidence. As a basic rule of Texas contract construction, if a contract is clear and unambiguous on its face, courts will not consider oral representations by the parties in interpreting the contract.[10] Parol agreements, negotiations and representations are inadmissible

---

[8] Id. at 248.

[9] Id.

[10] R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 519 (Tex. 1980).

in Texas and cannot be used to alter the express terms of a written contract.[11]

In an attempt to escape the parol evidence rule, the Appellants maintain that they are not attempting to contradict the terms of the $400,000 note, but are simply attempting to prove that Wilde's representations induced them to execute a note containing terms to which they did not agree. Such an assertion cannot save the Appellants. Texas courts bind parties to the express terms of the promissory notes they execute. As the Texas supreme court held in a case involving a loan agreement,

> A party to a written agreement (promissory note) is charged as a matter of law with knowledge of its provisions and as a matter of law cannot claim fraud when he is bound to the provisions unless he can demonstrate he was tricked into its execution.[12]

Therefore to fall within this exception to the parol evidence rule, a party must prove that he was fraudulently induced to enter a contract. Absent a showing by the Appellants that Wilde fraudulently induced them to execute the $400,000 note, evidence of representations and negotiations prior to execution of the note is inadmissible.

In Simpson v. MBank Dallas, N.A.,[13] a guarantor attempted to avoid liability on a note by claiming that the bank represented prior to execution that his signature was a "mere technicality" and

---

[11]Texas Export Development Corp. v. Schleder, 519 S.W.2d 134, 137 (Tex. Civ. App. - Dallas 1974).

[12]Town North National Bank v. Broaddus, 569 S.W.2d 489, 492 (Tex. 1978)(quoting Texas Export, 519 S.W.2d at 139).

[13]724 S.W.2d 102 (Tex. Civ. App. - Dallas 1987).

that MBank would not attempt to enforce its guaranty. The court upheld the trial court's grant of summary judgment for MBank, stating:

> The law is well settled that in order for [the guarantor] to prove fraud in the inducement sufficiently to allow an exception to the parol evidence rule to come into play, he must show some type of trickery, artifice or device employed by MBank in addition to showing that MBank represented to him that he would not be liable on the guaranty.[14]

The Appellants have presented no evidence that the Meadowbrook or Wilde employed any trickery, artifice or device other than Wilde's alleged representation that he would restructure the loan from 15 to 20 years. In fact, the Appellants' evidence reflects that Wilde and the Bank never engaged in a course of conduct calculated to deceive the Appellants into believing that any alleged oral agreement would also be honored on the note.

Parties to a promissory note are charged as a matter of law with knowledge of its provisions, and as a matter of law cannot claim fraud unless they demonstrate that they were tricked into its execution.[15] The Appellants executed the note with full knowledge of the facts that they claim constituted fraud. They knew at the time they signed the note that it required a 15 year payout and that they were responsible for payment under that note. They

---

[14]Id. at 108 (emphasis added). See also Town North, 569 S.W.2d at 492; Clark v. Dedina, 658 S.W.2d 293, 296 (Tex. App. – Houston (1st Dist.) 1983). As the district court noted in the present case, "[c]learly an action for negligent misrepresentation could not, by definition, include evidence of artifice or trickery necessary to meet the requirements of this exception" to the parol evidence rule.

[15]Town North, 569 S.W.2d at 492.

cannot now be heard to complain that Wilde deceived them into signing the note based on a promise to vary its terms in the future.

If fraud could be predicated on a party's allegation of any oral promise to vary the express terms of the note, then any collateral parol agreement might be asserted to contradict, vary or even abrogate any written contract. The result would destroy the parol evidence rule altogether resulting in uncertainty and confusion in the law of contracts in general and negotiable instruments in particular.[16]

There is no genuine fact issue here, and it is clear that the Appellees should prevail on the law. The Appellants signed the loan documents at closing, agreeing to a 15 year payout under the note, and cannot now avoid their contractual obligation based on an alleged parol representation.

B.  Duress

The district court concluded that the Appellants failed to present any evidence of duress. The Appellants contend, however, that their affidavits submitted in opposition to the summary judgment motions illustrate the "extreme precarious financial position" in which they found themselves at the time of the December closing. Rosas stated that "[a]t the December Closing, Wilde threatened that unless the Joint Venture accepted the terms which had been negotiated, [First Bank] would foreclose on [its]

---

[16]Id.

10

first lien."  The Appellants also assert that the fact that the disbursements planned for the $400,000 loan did not comply with the SBA authorization is further evidence of duress.  We fail to see, however, how these statements can be deemed evidence of duress.

Texas courts have held that there can be no duress unless (1) there is a threat to do some act that the party threatening has no legal right to do, (2) there is some illegal exaction or some fraud or deception, and (3) the restraint must be so imminent as to destroy a party's free agency without present means of protection.[17] Neither the Appellants' complaint nor the affidavits allege any action by Wilde that meets the elements set forth above.  Simply stated, the alleged acts constitute no threat to undertake an unauthorized, deceptive, fraudulent or illegal act.  Both the "threat" not to fund the loan and the "threat" that First Bank would foreclose on the Joint Venture alleges no illegal or fraudulent act.  Both scenarios were within the respective banks' legal rights.

The Appellants also failed to articulate how Wilde's alleged threats destroyed the Appellants' free agency.[18]  Instead of attempting to address each of the elements of a duress cause of action, the entirety of the Appellants' arguments on the duress issue focuses on the Joint Venture's "extreme precarious financial

---

[17]Tower Contracting Co. v. Burden Brothers, Inc., 482 S.W.2d 330, 335 (Tex. Civ. App. - Dallas 1972); See also Palmer Barge Line, Inc. v. Southern Petroleum Trading Co., 776 F.2d 502, 505 (5th Cir. 1985).

[18]Tower Contracting, 482 S.W.2d at 335.

11

position."  The affidavits set forth no facts demonstrating that Wilde, and not the Joint Venture's financial hardship, was responsible for forcing the Appellants to execute the $400,000 note.  The district court recognized that the Appellants' argument "is supported by neither legal authority nor by any factual clarification of Wilde's alleged threats."  As a consequence of the Appellants' failure to plead the elements of duress properly, there is no issue whatsoever, either legal or factual.  Therefore, the district court was correct in rejecting the Appellants' claim of duress.

## C.    Breach of Good Faith and Fair Dealing

The district court also rejected the Appellants' claim that the Bank and Wilde breached a duty of good faith and fair dealing because Texas courts do not recognize such a duty from lender to borrower.[19]  On appeal, the Appellants characterize this claim as one for breach of the implied promise not to interfere or hinder the Appellants' right to perform their contract.[20]  The Appellants apparently base their argument on Meadowbrook's alleged deviation from the guidelines set forth in the SBA authorizations with respect to disbursement of the proceeds.  In effect, they argue that Meadowbrook disbursed the loan proceeds to benefit its

---

[19]See Victoria Bank and Trust Company v. Brady, 779 S.W.2d 893, 902 (Tex. App. - Corpus Christi 1989), aff'd in part, rev'd in part on other grounds, 811 S.W.2d 931 (1991).

[20]See Texas National Bank v. Sandia Mortgage Corp., 872 F.2d 692 (5th Cir. 1989).

12

position as mortgagee and not in accordance with the SBA's authorizations. This argument is without merit.

SBA regulations with respect to the purpose of the loan authorization provide helpful guidance. Section 122.5-5[21] reads, "[i]f SBA approves a loan request, a loan authorization is issued. The authorization states the terms and conditions on which SBA is willing to make, participate in or guarantee a loan but it is not a contract to loan money." Section 120.202-5[22] provides that the

> SBA shall be released from obligation to purchase its share of the guaranteed loan unless the Lender has substantially complied with all of the provisions of these regulations, the Guaranty Agreement and the <u>Loan Authorization</u>, and has not failed to disclose material facts, and had made no material misrepresentations to SBA with respect to the loan; or upon the happening of any one or more of the following events:
> (a) Defective Closing. Failure of the Lender to close and disburse the loan <u>substantially in accordance with the terms and requirements of the loan instructions (including the loan authorization)</u>, or to service the loan in a prudent manner, either of which may result in a substantial loss on the loan.[23]

Read together, these regulations make clear that the loan authorization is not a contract to lend. Rather, it is an agreement between the SBA and the lending institution defining under what conditions the SBA will honor its guaranty. The SBA is obligated to perform only if the Bank substantially complies with the conditions of the agreement. When the Joint Venture defaulted on the notes, the SBA conducted a prepurchase review of Meadowbrook's distribution of the loan funds prior to purchasing

[21]13 C.F.R. § 122.5-5.

[22]13 C.F.R. § 120.202-5.

[23]Emphasis added.

13

its 85 percent guaranty. The SBA apparently concluded that the distribution complied with the SBA's loan authorizations because it honored its guaranty. We find it incongruous that Meadowbrook could have both managed the loans in an inequitable manner and comported with the SBA authorizations. The SBA's determination as to whether the Bank's actions comport with its guidelines is dispositive of the issue.[24]

D.    Breach of Depository Agreement

Although the Appellants claimed before the district court that Meadowbrook breached its depository agreement and wrongfully dishonored checks when there were sufficient funds in the operating account, the district court made no mention of this claim in its memorandum order. Instead, in its judgment, the court declared, "for the reasons stated in the memorandum order of this date, it is ordered that plaintiffs take nothing on their claims against defendants in this case." Although the court's opinion does not discuss the cause of action for breach of the depository agreement, this in no way renders invalid the court's dismissal of that claim. A court is not required, after disposing of all the issues in a judgment, to explain its determination on each and every issue in an attached memorandum.[25]

---

[24]See also Klehm v. Grecian Chalet, Ltd., 164 Ill. App. 3d 610, 518 N.E.2d 187 (1987).

[25]Murdaugh Volkswagen, Inc. v. First National Bank, 741 F.2d 41, 44 (4th Cir. 1984).

Clearly, the district court dismissed the Appellants' claim because they failed to present the requisite testimony and documentary evidence to raise a fact issue in response to the motions for summary judgment filed by Meadowbrook and Wilde. The Appellants' affidavits fail to meet the requirements for specificity to raise a fact issue and thereby defeat summary judgment under the standard set forth by <u>Anderson v. Liberty Lobby, Inc.</u> There, the Supreme Court held that, "when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."[26]

Rosas and Perez submitted the following affidavit testimony in response to the motions for summary judgment:

Rosas:

Meadowbrook did deposit some loan funds in the operating account which the Joint Venture maintained, but often refused to honor checks, even though the Joint Venture account balance wa much greater than the face amount of the check. Attached hereto as Exhibit "K" are true and correct copies of return check notices sent to the Joint Venture by Meadowbrook, which show that Meadowbrook dishonored checks despite there being sufficient funds in the Joint Venture Account.

Perez:

Meadowbrook did deposit funds in the operating account which the Joint Venture maintained, but often refused to honor checks, even though the Joint Venture account balance was much greater than the fact amount of the check.

---

[26]477 U.S. at 250. <u>See also</u> <u>Miller v. Soliz</u>, 648 S.W.2d 734, 737 (Tex. Civ. App. - Corpus Christi 1983); <u>Westland Oil Development Corp. v. Gulf Oil Corp.</u>, 637 S.W. 2d 903, 907 (Tex. 1982).

To bolster this testimony, the Appellants attached two document pages listing four checks totaling $350. The documents, however, are vague and are not self-explanatory.[27]

In Wilde's affidavit in support of his motion for summary judgment, he averred that

> There were several occasions in which Meadowbrook denied payment on Cleburne Joint Venture checks written on a Operating Account at Meadowbrook due to Cleburne Joint Venture maintaining insufficient funds in the account. Only once did Meadowbrook refuse payment on a check despite sufficient funds existing in the account. This occurred when Cleburne Joint Venture attempted to purchase approximately $600.00 of equipment not authorized by the SBA in the Authorization and Loan Agreement.

There is no genuine issue with respect to the fact that checks were dishonored even though there were sufficient funds in the account to cover them. The Appellants presented no evidence, however, to counter Wilde's statement that the checks were for unauthorized purchases. In fact, the Appellants have never explained what the checks were for.

Moreover, the Appellants have never asserted the specific damages they might have suffered. Tex. Bus. & Comm. Code § 4.402 provides in pertinent part, "A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item....Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in

---

[27]They show that on two different dates, the balance in the account was $11,334.69 and $19,028.07. The legend indicates that the balance in the account was insufficient to pay the items listed. The documents also purport to show that three of the four checks were returned, and one was paid. But this was done by hand-lining through the word "paid" so that only the word "returned" remained.

each case."[28]   An element of a cause of action under this section is that the customer suffer damages.   The Appellants made the conclusory statement in their response to the summary judgment motions that "damages for loss of credit, loss of time, loss of money, loss of use of money and mental anguish" were genuine issues of material fact.   But the Appellants have done nothing to place those "facts" in issue.   Such unsupported statements are wholly insufficient to defeat summary judgment.

### E.   The SBA and Collins

In the district court the Appellants asserted claims of breach of contract and promissory estoppel against the SBA and Collins based on the SBA's alleged promises to the Appellants to purchase and service the promissory notes from Meadowbrook.   Before the SBA responded to the Appellants' discovery requests, the district court granted summary judgment in favor of the SBA and Collins, concluding that as a matter of law the Appellants could not invoke estoppel against the government, and that any agreement, even had it existed, could not be enforced against the government.   On appeal, the Appellants contend that the district court erred in ruling on the summary judgment motion before discovery was complete.   We disagree.

It is "the established law of this Circuit that a plaintiff's entitlement to discovery prior to a ruling on a summary judgment motion may be cut off when, within the trial court's discretion,

---

[28]Tex. Bus. & Comm. Code Ann. § 4.402 (Vernon 1968).

17

the record indicates that further discovery will not likely produce facts necessary to defeat the motion."[29]  As the issues to be decided by the district court were purely legal in nature, the court did not abuse its discretion in deciding the summary judgment motion prior to completion of discovery.

Although the Supreme Court has not completely foreclosed the possibility that an estoppel claim might lie against the government, it has noted that its use is severely restricted.[30]  In fact, recently in OPM v. Richmond[31] the Court noted that it has reversed every circuit court finding of estoppel against the government that it has reviewed.[32]  Particularly, the Court declared that "claims for estoppel cannot be entertained where public money is at stake."[33]

The Appellants argue that their estoppel claim is not a claim for payment of money from the public treasury, but instead seeks to enforce the SBA's alleged promise to service the promissory notes. The Appellants fail to recognize, however, that public monies are indeed at stake.  They borrowed a half a million dollars secured by

---

[29]Fisher v. Metropolitan Life Ins. Co., 895 F.2d 1073, 1978 (5th Cir. 1990).

[30]See Heckler v. Community Health Services, Inc., 467 U.S. 51, 60 (1984).  See also Schweiker v. Hansen, 450 U.S. 785, 789 (1981)(Government will not be estopped in civil litigation without a showing that government agents engaged in affirmative misconduct.)

[31]110 S.Ct. 2465 (1990).

[32]Id. at 2470.

[33]Id. at 2473.

the guaranty of the SBA. When the loan went into default, the SBA honored its guaranty with payments from the federal treasury. Estopping the government by enforcing a promise to service the notes would bar further proper and legitimate attempts to recover that money. Therefore, estoppel will not lie against the government.

The Appellants' claim of breach of contract against the SBA also must fail. It is a familiar tenet of government contracts that the government cannot be bound by the unauthorized acts of its agents.[34] In U.S. v. R & D One Stop Records, Inc.[35] we held that the representation of certain SBA officials that no individual recourse would be taken against the guarantors was outside the authority of the SBA agents, and the government was entitled to summary judgment as a matter of law. The same is true in this case. Any representation made by an SBA official that the SBA would purchase and service the promissory notes clearly exceeded the official's scope of authority. As we expressed in

R & D One Stop,

> The possible misrepresentations by SBA representatives are of no help to guarantors in their defense of fraud or mutual mistake. Even assuming such misrepresentations were made, the United States is not bound by actions of its agents exceeding their scope of authority.[36]

---

[34]Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

[35]661 F.2d 433 (5th Cir. 1981).

[36]Id. at 434.

19

Furthermore, it was incumbent upon the Appellants to ascertain whether the officials with whom they dealt acted within the scope of their authority.[37]  Not having done so, they cannot now be heard to complain that the officials exceeded that scope.

IV.

CONCLUSION

The Appellants were victims of a faltering economy and an unfortunate set of difficulties in the construction of their market, not the least of which were their apparent lack of experience and judgment.  They were not, however, victims of Meadowbrook, Wilde, or the SBA.  The Appellants were unable to demonstrate to the district court that there were any genuine issues of material fact sufficient to overcome the Defendants' motions for summary judgment, or that the actions taken by Wilde and Meadowbrook constituted negligent misrepresentation, placed the Appellants under duress, breached any duty, or breached the depository agreement.  In addition, the Appellants failed to show that they could prevail on any claim against the SBA and Collins. Therefore, the district court committed no reversible error in granting summary judgment in favor of the Defendants.  For the foregoing reasons, we AFFIRM.

---

[37]Merrill, 332 U.S. at 384.  See also U.S. v. Lowell, 557 F.2d 70, 72 (6th Cir. 1977).