United States Court of Appeals,

Fifth Circuit.

No. 91–4707.

HAROLD J. BOGGAN, et al., Plaintiffs–Appellees,

v.

DATA SYSTEMS NETWORK CORP., et al., Defendants–Appellants.

Aug. 25, 1992.

Appeal from the United States District Court for the Eastern District of Texas.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

This is one of those rare cases in which we must overturn a civil jury verdict for insufficiency of the evidence. We do not do so nonchalantly. We have sifted through the record, searching, both at the direction of the parties and on our own, for evidence to sustain the jury's verdict in favor of the plaintiff. Concluding that there is no evidence to support plaintiff's claim of fraudulent inducement, we REVERSE the judgment.

## I. BACKGROUND

Harold Boggan owned 51% of Interprint, Inc., a supplier of computers and computer equipment with offices in Dallas and Houston. Through a listing broker, Boggan attempted to locate a company to buy or merge with Interprint. The broker located several potential buyers, including Data Systems Network Corporation ("Data Systems"). Boggan first met Data Systems's President, Michael Grieves, in late 1987, and they met and spoke again on several occasions during the fall of 1988. According to Boggan, during these early communications between Boggan/Interprint and Grieves/Data Systems, Grieves told Boggan that entrepreneur Warren Avis (founder of Avis Rent–A–Car), was intimately involved in Data Systems, that Grieves had a close relationship with Avis, and that Data Systems' purchase of Interprint would allow Boggan to become "part of the [Warren Avis] fold."

In January of 1989, Grieves travelled to Texas to examine Interprint's operations. Boggan conveyed to Grieves exactly what Boggan expected to receive from Data Systems if it wanted to buy Interprint: (1) two times the net book value of the company; (2) an employment agreement compensating Boggan $60,000 a year; (3) repayment of a $60,000 loan to Interprint guaranteed by Boggan; (4) health insurance coverage for Boggan; (5) a company car for Boggan; (6) accrued vacation time for Boggan; (7) fair and equitable treatment of Interprint employees; (8) assumption of Interprint's 3–year lease of a building leased from a Boggan partnership. At the end of the meeting, Grieves told Boggan that "I think we have a deal," but said that he would have to "run it by" the Data Systems Board and get a formal proposal drafted by Data Systems's lawyer. Grieves specifically advised Boggan to retain counsel, but Grieves indicated that his own attorney would do the bulk of the paperwork, while Boggan's attorney would simply assist in the preparation of schedules and ancillary documents.

In February, Grieves sent Boggan a Letter of Intent drafted by Data Systems' attorney, which indicated that the letter was "a proposal and not a final agreement. It is subject to final negotiations and approval by [Data Systems'] counsel, our bank, and our board of directors." One of the more critical provisions in the Letter of Intent involved the inventory and accounts receivables. The letter stated:

> Since [Data Systems] is only interested in acquiring viable assets, [Data Systems] would want the option of returning any accounts receivables or inventory after 120 days to Interprint that was found to be bad; that is, accounts receivable that was non-collectable or *inventory that was obsolete.* This would result in a commensurate reduction in book value. (11 R. 113)

The term "obsolete" was not defined in the letter. Boggan testified that based on his discussions with Grieves, he understood this "set-off" provision to refer to "non-current" inventory as reflected on Interprint's balance sheet: roughly $170,000 worth. (11 R. 150) The total inventories as reflected in the balance sheet was valued at roughly $900,000. Thus, based on his conversations with Grieves, Boggan believed that he was obliged to sell the $170,000 in non-current inventory lest it be deducted from the book value of his company (and hence from the purchase price). Boggan testified that at

no time did Grieves explain that the set-off provision applied to *all* of the inventories. But in any event, Boggan was aware that a deal had not yet been struck. To be sure, even after receipt of the Letter of Intent, Boggan continued his efforts to sell, merge or refinance Interprint.

During April and early May, Data Systems circulated four different drafts of a proposed asset purchase agreement to Boggan. Although the purchase price remained subject to certain set-off rights in all drafts, the set-off provision itself changed substantially between the third draft (dated May 1, 1989) and fourth draft (dated May 2, 1989). In all of the drafts except the fourth draft (dated May 2, 1989), Data Systems could reduce, or set-off, book value only for "obsolete" inventory as stated in the Letter of Intent. The term "obsolete" was not defined in the drafts, nor was any reference made to the term "non-current" inventory. In the fourth draft (dated May 2, 1992), the set-off provision allowed Data Systems to set-off the value of *all* Interprint inventory, not sold or returned to vendors within 120 days after closing, against book value. That change was marked so that Boggan and his advisers would take note of it. Indeed, Boggan read the changed provision and discussed it with his accountant, who discussed it with Boggan's attorney. Neither Boggan nor his advisers discussed this change with Grieves, however. The set-off provision in the fourth draft was incorporated into a final Asset Purchase Agreement, executed by the parties on May 4. The parties also entered into an Employment Agreement.

Boggan did not sell or return to vendors most of the Interprint inventory with the 120 days following closing. Data Systems set off the unsold and unreturned inventory against the balance of the purchase price and offered to give Boggan the remaining inventory that had not yet been sold. Boggan sued Data Systems alleging multiple causes of action against Data Systems and the Grieveses.[1] The Defendants counterclaimed for breach of the Asset Purchase Agreement and Employment Agreement, violations of the Texas Deceptive Trade Practices Act, and declaratory

---

[1]Actually, Boggan and Boggan Corporation, f/k/a Interprint sued. We refer to them collectively as "Boggan." In an amended complaint, Boggan added H & R Joint Venture as a plaintiff, and Grieves and Grieves' spouse as defendants.

relief.

The district court entered partial summary judgment for the defendants on several of Boggan's claims, directed a verdict in their favor on others, and submitted the rest of the claims to a jury. The jury returned a verdict in favor of Boggan on his claim for fraudulent inducement, awarding compensatory damages in the amount of $783,076.43 against Data Systems and Grieves. Based on the jury's finding that Data Systems and Grieves acted "willfully and maliciously" in fraudulently inducing Boggan and Interprint to enter the Asset Purchase Agreement and Employment Agreement, the jury awarded punitive damages in the amount of $1.5 million against Data Systems and $1 million against Grieves. The district court denied the Defendants' motion for judgment notwithstanding the verdict or, alternatively, motion for a new trial and entered judgment in accordance with verdict. Data Systems and Grieves appealed; Boggan did not.

## II. DISCUSSION

Under Texas law, a plaintiff must establish six elements to prove actionable common law fraud: (1) the making of a material representation; (2) that was false; (3) that, when the speaker made it, the speaker knew was false or made it recklessly without knowledge of its truth and as a positive assertion; (4) that the speaker made it with the intent that it should be acted on by the other party; (5) that the other party acted in reliance on it; and, (6) that the other party suffered injury thereby. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983) (citation omitted). Defendants Data Systems and Grieves, the appellants herein, argue that the evidence was insufficient to sustain a jury verdict on the fraudulent inducement claim because Plaintiff Boggan failed to prove any misrepresentations of material fact (elements 1 and 2) made by the defendants and failed to prove that the defendants acted in justifiable reliance on the alleged misrepresentations of material fact (element 5). Thus, the defendants contend that the district court should have directed a verdict in their favor or entered a judgment notwithstanding the verdict.

On appeal, this Court employs the same standard that the district court used in ruling on the defendants' motions: The court "must review the evidence in the light and with all reasonable inferences most favorable to the party opposing the directed verdict or judgment notwithstanding the verdict." *Fruge v. Penrod Drilling Co.,* 918 F.2d 1163, 1165–66 (5th Cir.1990) (citations omitted). As we first explained in *Boeing Co. v. Shipman* and have often repeated:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable [persons] could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

411 F.2d 365, 374–75 (5th Cir.1969) (en banc), *quoted in Turner v. Upton County, Texas,* 967 F.2d 181, 184–185, slip op. 6240, 6243–44 (5th Cir.1992) (reversing jury verdict for insufficient evidence). The district court would err in directing a verdict or granting judgment notwithstanding the verdict "[i]f the material evidence is such that reasonable and fair-minded persons could reach different conclusions based on their determination of the relevant facts." *Id.*

## A.

At the outset we observe that plaintiff's primary theory during trial, and the *only* theory considered by the jury under the charge, was that Grieves made affirmative misstatements of fact. The court instructed the jury that the essential elements of the fraudulent inducement claim requires proof that the defendants made a false material representation that consisted of a positive untrue statement of material fact: The representation must have been false and material in the sense that it related to a matter of some importance or significance. The plaintiffs objected to this instruction, requesting that the court include language instructing the jury that omissions or concealments of fact can also constitute misrepresentations of material fact. The court did not submit the fraudulent inducement claim to the jury under these theories, and the plaintiffs did not cross-appeal. Because

"theories not before the jury ... may not provide the basis for upholding the jury verdict," *Charles Woods Television Corp. v. Capital Cities/ABC, Inc.,* 869 F.2d 1155, 1160 n. 6 (8th Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 145, 107 L.Ed.2d 104 (1989), the verdict can only be sustained on appeal based on the fraud theory submitted to the jury, i.e., affirmative misrepresentations of fact. Omissions and concealments simply will not do. *See id.* (holding that fraud theories not before the jury were not properly before the court on appeal).

B.

Boggan contends that Grieves made a whole host of affirmative misrepresentations of material fact, including but not limited to the discussions pertaining to the set-off provision. Specifically, Boggan submits that Grieves misrepresented:

> the special interest and involvement of Warren Avis, the benefits that Boggan and Interprint would experience as an "Avis Information Systems Company" and the Avis "fold," ... Boggan's future role and power as general manager, "in charge" of sales management in Dallas, his limited role in the actual sale of "old" inventory, the portion of the inventory the setoff would be applied to, Boggan's coverage under health insurance, the use of his car, use of accrued vacation time, reimbursement for vacation time of former Interprint employees....[2]

Appellee Boggan's Brief at 25–26. Boggan is correct in arguing that evidence of even a single misrepresentation of material fact will suffice to sustain the verdict. To Boggan's misfortune, we have found none.

Boggan recognizes that the verbal exchange at the January meeting did not constitute a binding agreement between the parties. He so testified. The parties were well aware that the final

_____

[2]The list continues, but these alleged misrepresentations are not representations at all:

> accusing him of the theft of inventory, repudiation of the Interprint lease with a balance of $124,600 owed to Boggan his realty partner, fictitious charge-backs for inventory, fictitious chargebacks for so called "unrecorded liability contracts," and refusing to reimburse Boggan for the cost of a trip taken to Detroit at Grieves' behest.

Appellee Boggan's Brief at 26.

terms of the deal would be incorporated into a writing. It is well settled that the negotiations and discussions leading up to the writing cannot displace the terms of the written agreement. *Turner v. Johnson & Johnson,* 809 F.2d 90, 97 (1st Cir.1986) ("where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point" under "reasonable" reliance standard). Moreover, "[a]bsent fraud, one is presumed to know the contents of a document and has an obligation to protect themselves [sic] by reading documents prior to signing." *Nautical Landings Marina, Inc. v. First Nat'l Bank,* 791 S.W.2d 293, 298 (Tex.App.—Corpus Christi 1990, writ denied) (citing *G–W–L, Inc. v. Robichaux,* 643 S.W.2d 392, 393 (Tex.1982)). Grieves' tentative assent to Boggan's "wish list" and his statement "I think we have a deal" cannot, under the circumstances of this case, constitute actionable misrepresentations.

Boggan does not claim that he was duped into signing a final agreement that purported to be the agreement reached but in fact was something else.[3] Boggan, with the assistance of counsel and an accountant, reviewed the final draft of the agreement and signed it. Whatever discussions the parties had entered into up to that point concerning Boggan's future role in the company, his coverage under health insurance, the use of a car, use of accrued vacation time, reimbursement for vacation time of former Interprint employees, and the like, were governed by the explicit terms of the Asset Purchase Agreement. Any statements made by Grieves regarding those terms during the negotiation stages of the deal were expressions of *intent,* not assertions of *fact.* Their omission from the final draft does not render Grieves' earlier assurances misrepresentations of *fact.* To hold otherwise would turn contract law on its head and vitiate the parol evidence rule.

---

[3]Thus, those Texas cases finding fraud when a party induces another party who is "excusably ignorant" of the nature of the contractual obligations into a written contract that does not reflect the parties' true agreement are inapposite. *E.g., Ellison v. Knapek,* 421 S.W.2d 474 (Tex.Civ.App.—Waco 1967, writ ref'd n.r.e.); *Hemphill–McCombs Ford, Inc. v. Kellner,* 419 S.W.2d 887 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r.e.).

As far as the set-off provision, the language in the final draft unequivocally states that the set-off would apply to *all* inventory. To the extent that Boggan understood, based on his discussions with Grieves, that the set-off would only apply to "non-current" inventory, his reliance on Grieves' comments were misplaced: if anything, Grieves' statements amounted to expressions of opinion, perhaps intent, but certainly not fact. *See Fina Supply Inc. v. Abilene Nat'l Bank,* 726 S.W.2d 537, 540 (Tex.1987) ("A representation as to the legal effect of a document is regarded as a statement of opinion rather than of fact and will not ordinarily support an action for fraud."); *Bryant v. Transcontinental Gas Pipe Line Corp.,* 821 S.W.2d 187, 190 (Tex.App.—Houston [14th Dist.] 1991) ("Generally, fraud cannot arise from pure expressions of opinion, whether personal or legal....").[4]

If Boggan had wanted to insure that the set-off provision would apply only to "non-current" inventory, as he understood that term, he should have incorporated his definition of "non-current" into the Asset Purchase Agreement. Significantly, that term—"non-current" inventory—was derived from Interprint's balance sheet, with which Boggan was intimately more familiar than Grieves. If nothing else, Boggan, a successful, experienced, and sagacious businessman, should not have signed the final agreement which explicitly provided for a set-off against *all* inventory not sold within 120 days. The terms of the set-off provision could not have been clearer.

## C.

Recognizing the frailty of the affirmative misrepresentation theory, Boggan contends in the

---

[4]There are several exceptions to the rule that opinions are not actionable as fraudulent misrepresentations of fact: (1) when "a party having superior knowledge ... takes advantage of another's ignorance of the law to deceive him by studied concealment or misrepresentation;" (2) "where there is a fiduciary or confidential relationship of trust between the parties;" (3) where the "misrepresentations involving a point of law ... were intended and understood as [misrepresentations of fact];" *Fina,* 726 S.W.2d at 540; and (4) "when a statement of opinion ... is made with present knowledge that the statement is false or with present intent to deceive." *Bryant,* 821 S.W.2d at 190 (citing *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726 (Tex.1982)). The jury's verdict could not rest on a finding that the expression of opinion fell into one of these exceptions to the requirement of a representation of material fact because the jury did not consider that theory. In any event, none of the three exceptions applied in this case.

alternative that Grieves' nondisclosures and concealments of material facts support the verdict. *See Fiest v. Roesler,* 86 S.W.2d 787, 783 (Tex.Civ.App.—Austin 1935, no writ) ("when there is a duty to speak, fraud may consist in the concealment of a material fact"). Boggan maintains that Grieves misled him into believing that the Interprint–Data Systems deal would bring Boggan within the Warren Avis "fold." Boggan premises the requisite duty to disclose on several theories: that a special or "confidential" relationship developed between Boggan and Grieves, rather than the arm's length transaction described by Appellants,[5] and that Grieveses' partial disclosure required full disclosure to avoid deception.[6] Even if these theories had been submitted to the jury, which they were not, we would still not be persuaded. Boggan offers no authority, and we are aware of none, which would indicate that this transaction was anything short of arms-length or that any of the partial disclosures were material to the consummation of the deal. Perhaps Boggan was indeed enchanted by the aura of joining the Avis "fold," but it is clear that he entered into the deal for other more tangible, pecuniary reasons: two times book value for his business, an employment agreement, health insurance, a company car, and repayment of a $60,000 loan.[7] His "wish list" did not include adoption into the Avis family. Grieves representations in that regard, even if misrepresentations, were not material to the deal.

## III. CONCLUSION

Our search through the record, now complete, has turned up no evidence supporting the verdict in this case. We must reverse the judgment, therefore, and direct the district court to enter

---

[5]*See Peckham v. Johnson,* 98 S.W.2d 408, 416 (Tex.Civ.App.—Fort Worth 1936) ("confidential relation ... covers every form of relation between parties wherein confidence is reposed by one in another, and he relies and acts upon the representations of the other and is guilty of no derelictions on his own part"), *aff'd,* 132 Tex. 148, 120 S.W.2d 786 (1938).

[6]*See International Sec. Life Ins. Co. v. Finck,* 475 S.W.2d 363, 370 (Tex.Civ.App.—Amarillo 1971) ("duty to speak may arise from a partial disclosure ... for one may convey a false impression by the disclosure of some facts and the concealment of others"), *aff'd in part, rev'd in part,* 496 S.W.2d 544 (Tex.1973).

[7]He also wanted his employees to be treated fairly and the acquiring company to assume the 3–year building lease.

a take-nothing judgment in favor of the defendants.

REVERSED.