United States Court of Appeals, Fifth Circuit.

No. 93-2536.

QUEST EXPLORATION AND DEVELOPMENT COMPANY, Plaintiff-Appellant,

v.

TRANSCO ENERGY COMPANY and Transcontinental Gas Pipe Line Corporation, Defendants-Appellees.

July 1, 1994.

Appeal from the United States District Court For the Southern District of Texas.

Before POLITZ, Chief Judge, DAVIS and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this suit to void a settlement agreement on grounds of, inter alia, fraudulent inducement and economic duress, Plaintiff-Appellant Quest Exploration and Development Company (Quest) appeals the district court's grant of summary judgment in favor of Defendants-Appellees Transco Energy Company and Transcontinental Gas Pipe Line Corporation (collectively, Transco[1]). Finding no reversible error, we affirm.

I

FACTS AND PROCEEDINGS

Quest owned an interest in mineral production in the South Lake Arthur Field, principally a natural gas field situated in portions of Jefferson Davis, Vermilion, and Cameron Parishes in southwest Louisiana. The wells in which Quest owned interests

---

[1]On appeal, both parties treat Transcontinental Gas Pipe Line Corp. and Transco Energy Corp. (Transcontinental's parent company) as one entity. For ease of reference, this opinion does likewise.

1

produced gas from that field for resale to purchasers.  In 1980 Quest and several other producers in the field entered into a Gas Purchase Agreement (the GPA) with Transco, which purchased gas and transported it by pipeline to sell in interstate markets.  Under a take-or-pay clause in the GPA, Transco agreed either to take a specified minimum quantity from each producer's gas on a monthly basis and pay a set contract price for such quantities, or to pay the contract price for such quantities if it took a lesser quantity of gas (or no gas) into its pipeline.  Specifically, Transco was required to take or pay for 857 of Quest's delivery capacity of the covered well or wells.

Responding in September 1984 to "current serious marketing conditions,"[2] Transco requested that certain portions of the GPA be temporarily suspended, and that a Transco-proposed "Market Maintenance Plan" (MMP) be implemented that would modify other terms of the GPA during the period of suspension.  Quest acceded to a modification of the GPA and agreed to participate in the MMP as an accommodation to Transco.  This temporary modification of the GPA was specified to be effective from November 1, 1984 to October 31, 1985:  Once the MMP expired at the end of October 1985, the GPA's original take-or-pay provisions would again dictate Transco's obligations until the GPA's original expiration date in 1995.

_____

[2]The market for natural gas changed, and, contemporaneously, regulatory orders freed purchasers of gas at the delivery end of Transco's pipeline from paying minimum contractual prices to Transco.  Thus the purchase prices that Transco was committed to pay to producers under take-or-pay provisions were considerably higher than the sales prices that Transco could expect to receive for gas purchased from its customers.

Upon expiration of the MMP on 10-31-85, the parties again renegotiated the terms of the GPA—this time apparently at Quest's instance.[3] Quest expressed a desire to maintain a specified level of monthly income, hoping that Transco would agree to purchase a greater volume of gas at a lower unit price, which would generate the stream of income Quest needed to meet its financial obligations. Transco favored modification because of "falling natural gas prices," and apparently believed that the force majeure clause, as it related to general market conditions, applied.[4]

Transco and Quest conducted protracted settlement negotiations from November 1985 until a settlement was reached in March 1986. During the negotiations, Quest sought to make a "most favored nations" clause part of the settlement. Such status would have entitled Quest to a favorable change in the terms and conditions of its settlement agreement with Transco if Transco were later to enter into a more favorable settlement with any other producer in

---

[3]When deposed, Mark Gardner, Quest's president, testified that before the middle of November, he and the lawyer-secretary for Quest, Jack Manning, initiated a meeting with Jim Sirois of Transco, and asked Sirois if, in view of Quest's small interest [a 27 working interest] in the field, Transco would be willing to discuss a settlement with Quest. Sirois was "kind enough to call Trisha Pollard to the meeting," and both Sirois and Pollard indicated that they would like to discuss some type of a settlement with Quest. A meeting was set up for late November to start these conversations, which meeting was only the "tip of the iceberg" in terms of the negotiations in which the parties engaged in efforts to reach the settlement agreement finally attained in March of 1986.

[4]Transco relied on "unforeseen regulatory changes in binding FERC orders" that relieved purchasers of gas from Transco from paying minimum prices for gas under contracts with Transco as constituting a force majeure event.

3

the field.  According to Quest, "Transco personnel repeatedly assured Quest that, "although they cannot put such a provision in a contract, no better deal would be made with other parties to the [GPA].' "

Consistent with Transco's insistence, the settlement agreement did not contain a "most favored nations" clause.  Quite to the contrary, after stating that Transco was released from, and relieved of liability for, any and all claims related to the GPA, the agreement provided that:

> This Agreement and the [GPA] amended hereby constitute the entire agreement between the parties hereto with respect to the transactions contemplated herein, supersedes and is in full substitution for any and all prior agreements and understandings between them related to such transactions, and no party shall be liable or bound to any other party hereto in any manner with respect to such transactions by any warranties, representations, indemnities, covenants or agreements except as specifically set forth herein.

The settlement agreement was signed in March 1986 by, among others, Quest's president, Mark Gardner, and its lawyer-secretary, Jack Manning.  Among the terms of the settlement, one provided for Quest to receive a cash payment of $2 million, and another reduced Transco's take-or-pay obligations by half.

Quest asserts that, during the period of negotiation, Transco unilaterally reduced the volume of its monthly "take" from Quest from the eighty-five percent of Quest's delivery capacity as required under the GPA to no more than five percent, and refused to "pay" for the untaken difference.  Transco, Quest contends, had no legal right to withhold the minimum payments to which Quest was entitled under the GPA.  Quest asserts that by October 1985—before

4

negotiation of the settlement agreement and before Transco reduced the amount of gas it would take—Quest had lost $4 million in part as a result of Transco's refusal to fulfill its obligations under the GPA and MMP. Quest also asserts that one of the reasons which forced it to settle the dispute was the precipitous drop in its gas sales revenue, which resulted from its participation in the MMP—the GPA's temporary modification in which Quest *voluntarily* participated.[5] Quest thus insists that, as it was facing imminent bankruptcy because of Transco's unlawful conduct, Quest's forced settlement was the result of acts constituting economic duress by Transco.

Quest filed the instant suit in February 1988, almost two years after the March 1986 settlement of which it complains. In its complaint, Quest fired a broad side of charges ranging from antitrust and fraud to breach of contract. Unfortunately for Quest, though, all of these charges arose from conduct that related to the GPA and that occurred *before* the settlement agreement. Consequently, concluded the district court, all claims were barred by the plain terms of that agreement. Apparently conceding this point,[6] Quest nonetheless asserted that the settlement was

---

[5]We speculate that Quest's alleged $4 million loss may have resulted primarily from its voluntary participation in the MMP rather than from Transco's conduct after October 1985, of which conduct Quest now complains. Quest offers no evidence to demonstrate that its alleged losses resulted from Transco's breach of the GPA or MMP rather than from Quest's participation in the MMP.

[6]At trial and on appeal, Quest does not appear to contest that the settlement agreement would bar all of its claims if the agreement were enforceable.

unenforceable because it was fraudulently induced:  Although Transco had "represented" that it would make no better deals with other producers, Transco made settlements with two other producers in the field on terms more favorable than those received by Quest—albeit at a time when Transco was under the added pressure of a lawsuit filed by one of those two producers, which lawsuit Quest *elected* not to join, and of a lawsuit threatened by the other.  In the alternative, Quest insists that it was forced to enter the agreement because of economic duress, and that such duress rendered the settlement unenforceable.[7]  Quest appears to have asserted the fraudulent inducement and economic duress claims both as means to avoid the settlement agreement, and also as its sole remaining substantive grounds for recovery.  The district court rejected both of these contentions and granted summary judgment for Transco, from which Quest timely appealed.

---

One of the more puzzling aspects of this case is that the district court claims to be the one that called the parties' attention to the significance of the settlement agreement.  Given the obvious importance of this settlement agreement, it is unclear from the briefs and the record excerpts just why this case engendered almost five years of discovery and a 4900 page record.

[7]Interestingly, even though Quest maintains that it was forced to settle because of "severe economic distress" that was caused by Transco, Quest did not raise its economic duress claim—or possibly was *unaware* that it had been subjected to duress by Transco—until it learned that Transco had made better deals with other producers.  *See* Appellant's Reply Brief at 11.  In fact, Quest did not raise its economic duress claim until almost two years after it entered the settlement agreement.  *Cf. Palmer Barge Line, Inc. v. Southern Petroleum Trading Co., Ltd.,* 776 F.2d 502, 506 (5th Cir.1985) (holding that several-month "delay in raising a claim of duress in addition to the existence of a negotiated agreement between parties represented by counsel is compelling evidence that there was in fact no duress").

6

II

ANALYSIS

A. *Standard of Review*

The grant of a motion for summary judgment is reviewed de novo, using the same criteria employed by the district court.[8] In determining whether the grant was proper, we view all fact questions in the light most favorable to the nonmovant; questions of law are reviewed de novo.[9] Nonetheless, when a properly supported motion for summary judgment is made, the adverse party may not rest upon the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial to avoid the granting of the motion for summary judgment.[10] Unsubstantiated assertions are not competent summary judgment evidence.[11]

B. *Enforceable Settlement Agreement*

1. Fraudulent Inducement

Quest claims that its assent to the settlement agreement was induced by Transco's false representation that Quest would be given most favored nations status and that no better deal would be made with other parties to the GPA.

---

[8]*United States Fidelity & Guar. Co. v. Wigginton,* 964 F.2d 487, 489 (5th Cir.1992); *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988).

[9]*Walker,* 853 F.2d at 358.

[10]Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed. 202 (1986).

[11]*Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 272.

Reliance is, of course, an element of Quest's common law fraud claim.[12] Under Texas law, to survive summary judgment on its fraud claim, Quest had to offer competent summary judgment evidence that it relied on Transco's "fraudulent" conduct, and that such reliance was "justifiable."[13] Determination of justifiable reliance turns on whether—given the "fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on the plaintiff's part."[14]

Both parties to this settlement were sophisticated and were represented by attorneys.[15] The settlement agreement itself is in writing and is straightforward: It releases any and all claims related to the GPA, contains a comprehensive merger clause, and contains nothing remotely resembling a most favored nations clause. Indeed, Manning, who signed for Quest, is not just a sophisticated corporate officer but is also an attorney. He testified under oath that when he signed the agreement, he was aware of the merger provision and was also aware that Quest "*didn't get* " most favored

---

[12]*E.g., Boggan v. Data Systems Network Corp.,* 969 F.2d 149, 151-52 (5th Cir.1992); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983).

[13]*Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1025 (5th Cir.1990); *see Finger v. Morris,* 468 S.W.2d 572, 577 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.).

[14]*Haralson,* 919 F.2d at 1026.

[15]*See Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1312 (5th Cir.1983) (observing that validity of a settlement is buttressed by fact that parties to the settlement are sophisticated and are represented by counsel).

nations status in the settlement agreement despite repeated requests for such status. When Manning was asked why he allowed himself and Gardner to sign an agreement devoid of the much-desired "most favored nations" clause, he succinctly testified that "[i]t was the best deal we could get."[16]

Given these facts—and given the general rule that parties are presumed to have notice of what they have signed[17]—Quest has failed, as a matter of law, to carry its burden of presenting summary judgment evidence sufficient to raise a genuine issue of fact whether it was justified in relying on oral assurances that it would have "most favored nations" status. This is so even if we accept Quest's version of the facts and assume arguendo that Quest relied on such assurances.

2. Economic Duress

To establish economic duress, Quest had to show that (1) Transco threatened to do some act that it had no legal right to do; (2) the threat was of such character as to destroy the free agency

---

[16]When Manning was further asked why he did not stop the transaction to add this clause, he testified that he declined to:

> Because we had asked for that provision and they wouldn't give it to us. In effect we did that several times. If you ask did we ever say we wanted a favored nations clause, we did ask for it. We didn't get it.

He continued, "And I believe I have testified repeatedly that we asked for it, they refsued to give it to us."

[17]*E.g., Rosas v. United States Small Business Admin.,* 964 F.2d 351, 355-56 (5th Cir.1992) (applying rule to loan agreement); *Shindler v. Mid-Continent Life Ins. Co.,* 768 S.W.2d 331, 334 (Tex.App.—Houston [14th Dist.] 1989, no writ) (applying same to insurance agreement); *See Boggan v. Data Systems Network Corp.,* 969 F.2d 149, 153 (5th Cir.1992) (noting general rule).

of Quest, and that it overcomes Quest's will and causes Quest to do that which it would not otherwise do, and which it was not legally bound to do; (3) the restraint caused by such threat was imminent; and (4) the threat was such that Quest had no present means of protection.[18]

Notwithstanding Quest's conclusionary allegations that it was facing imminent bankruptcy and was thereby forced to enter the settlement agreement, we find no competent summary judgment evidence to support those assertions. The only summary judgment evidence on this score is the unsupported statements in affidavits of Quest's executives that payments by Transco were Quest's only source of income, and that Quest could not meet its financial obligations if it did not receive the income due under the GPA. Although Quest offered documentary evidence that its monthly revenue from Transco fell from $47,739.86 in October of 1985, the last month of the MMP, to $2,974.97 in February of 1986 (the month before Quest was "forced" to sign the Settlement Agreement), that is not evidence that Quest was otherwise unable to meet its financial obligations. The record contains no financial statements, bank statements, income tax returns, collection letters, or other evidence of Quest's imminent financial demise.[19] Again, unsubstantiated assertions are simply not competent summary

---

[18]*Nance v. RTC,* 803 S.W.2d 323, 333 (Tex.App.—San Antonio 1990), *writ denied,* 813 S.W.2d 154 (1991).

[19]*Cf. Palmer Barge Line Inc. v. Southern Petroleum Trading Co., Ltd.,* 776 F.2d 502, 505-06 (5th Cir.1985).

10

judgment evidence.[20]

III

CONCLUSION

For the foregoing reasons, we conclude that the district court properly granted summary judgment in favor of Transco on both the fraudulent inducement and economic duress claims.  Therefore, the judgment of the district court is in all respects

AFFIRMED.

---

[20]*Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 272 (1986).